

# NUMBER 13-09-00587-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

ANTHONY SAMORA A/K/A ANTHONY
"TANK" JACOB SAMORA,                                                Appellant,

v.

THE STATE OF TEXAS,                                                Appellee.

**On appeal from the 214th District Court
of Nueces County, Texas.**

# MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Yañez and Garza
Memorandum Opinion by Chief Justice Valdez**

Appellant, Anthony Samora a/k/a Anthony "Tank" Jacob Samora, was charged by

indictment with injury to a child, a first-degree felony. *See* TEX. PENAL CODE ANN. §

22.04(a), (c)(1), (e) (Vernon Supp. 2009). After a bench trial, the trial court found Samora

guilty of the underlying offense and sentenced him to fifty years' incarceration in the Institutional Division of the Texas Department of Criminal Justice. By three issues, Samora challenges the legal and factual sufficiency of the evidence supporting his conviction and argues that the trial court erred in overruling a hearsay objection that allowed the State to introduce evidence of Samora's prior bad acts. We affirm.

## I. BACKGROUND

The indictment in this case provided that on or about January 3, 2009, Samora "intentionally or knowingly cause[d] serious bodily injury to [B.W.[1]], a child 14 years of age or younger, by rolling or throwing or hitting . . . or by manner and means unknown to the Grand Jury." As a result of this incident, the child victim, B.W., then two years old, sustained twenty-nine visible injuries to her body and numerous injuries to her brain, which, after multiple surgeries, required a resection or removal of fifty percent of her brain. Samora waived his right to a jury trial, and a bench trial commenced.

### A. The State's Evidence

Tanya Flores, a detective with the family violence division of the Corpus Christi Police Department, testified that she first made contact with Samora at the Driscoll Children's Hospital ("Driscoll") in Corpus Christi, Texas, on the morning that B.W. was injured. Detective Flores stated that B.W. was brought to the Driscoll emergency room by B.W.'s mother, Katlyn Webb, at around 6:30 a.m. on January 3, 2009. Detective Flores noted that Samora did not accompany Webb to the hospital and that he arrived at the hospital at approximately 11:45 a.m. or noon. Later, Samora gave Detective Flores

---

[1] Because this case involves allegations of physical abuse against a minor child, we will identify the child by her initials throughout the opinion. *See* TEX. R. APP. P. 9.8.

permission to investigate his residence, and he voluntarily gave two recorded statements, both of which were entered into evidence.

In his first statement, Samora acknowledged that he had arrived home around 3:30 a.m. on January 3, 2009, after attending a party with his cousins. Once he arrived home, Webb, who usually stayed at Samora's residence, went to get food at the local Whataburger while Samora changed his clothes, leaving B.W. in Samora's sole custody. Samora alleged that it only took Webb fifteen minutes to get the food and that at some point in time, he heard B.W. start "gagging or choking." Webb, who was now home, and Samora went to tend to B.W. and noticed that B.W. was not breathing right. Samora recalled that Webb gave B.W. a couple of "rescue breaths" to help her breathe. The couple noticed that B.W.'s shirt was wet and surmised that B.W. had recently vomited. Samora also noted that B.W. appeared to be in and out of consciousness, so the couple put B.W. in the shower in an attempt to wake B.W. up; however, the couple's efforts were unsuccessful. Rather than immediately take B.W. to the emergency room for medical care, the couple waited several hours to see if B.W.'s condition would improve. Eventually, Webb took B.W. to the hospital. Samora tried to explain the various visible injuries on B.W. by claiming that he was "holding [B.W.] tight" when B.W. was limp in the shower. He also claimed to have seen a mark on B.W.'s eye and other marks on her body, but he explained that the marks were likely caused by B.W. rubbing her eyes and scratching or biting herself while she was sick.

In his second statement to police, Samora admitted that more had happened on the night in question than he revealed in his first statement. Samora told police that on the night of the incident, he played with B.W. by rolling her in a blanket even though Samora

admitted that he and B.W. were not "real close."[2]  Samora also noted that he asked B.W. if she wanted to go to bed but she said "no" and that she wanted to watch television at 3:30 a.m.  At some point during the interview, one of the investigators referenced B.W.'s head injury and stated, "I don't think you intended to hurt her when you did that," to which Samora responded by shaking his head side to side.  Despite this, Samora denied knowing the cause of B.W.'s injuries.  Samora tried to explain that scratches discovered on B.W.'s neck were caused by a dog that was playing with B.W.

Nancy Harper, M.D., the medical director for the Child Abuse and Resource Evaluation team at Driscoll, testified that B.W. had petechiae, which are small broken blood vessels, on her forehead and around her eyes, which are commonly caused by "chest compressions, strangulation, choking, [or] asphyxiation of a child."  Dr. Harper also noted that B.W. had several abrasions on her chin and neck and several abnormal bruises on her lower abdomen, chest, and hand.  Dr. Harper recalled that B.W. also had an injury to the nail on one of her middle fingers and a lot of swelling and bruising at the bottom of her left index finger.  Dr. Harper also saw lots of bruising on the top and inside of B.W.'s right ear.  When asked about B.W.'s ear injuries, Dr. Harper stated that "[e]ar bruising is just not seen commonly in children just from any sort of normal accidents.  This is what you see when there's been direct impact or trauma such as like boxing the ears or impact against a flat surface.  You can also see it when ears are grabbed . . . ."  Dr. Harper testified that "there's not a lot of good science behind dating bruises."

Dr. Harper then recounted a conversation she had with Webb regarding B.W.'s

---

[2] The blanket referenced by Samora was later identified as a comforter, and Detective Flores testified that some bodily fluid was found on the comforter.  Detective Flores photographed the comforter but was unsure whether the fluid was vomit or blood.  No tests were conducted on the comforter.

4

health history.[3] Webb told Dr. Harper that B.W. was a "pretty normal developmentally appropriate two-year-old child" who had some issues with asthma. Webb reported that she had previous problems with anemia and that she bruised easily, but that no other people in her family had bleeding disorders that required treatment. Webb further noted that around 3:45 a.m. on the morning of the incident, B.W. was unconscious and was breathing irregularly. Dr. Harper testified that those are symptoms of a child with a serious deep brain injury and that those symptoms generally occur within minutes, not hours, of the severe brain injury. Dr. Harper further testified that another physician's opinion that the brain injury occurred some eight to twelve hours prior to the time B.W. was admitted to the hospital—6:23 a.m.—was based on an initial CAT scan and was inconsistent with the injury that was actually found when B.W. underwent brain surgery. In addition, Dr. Harper stated that:

> For instance, when a child falls, you know, they might have a single plane of injury from where they contacted a surface. Sometimes we see a skull fracture. Maybe we see no skull fracture and might see a small subdural. We may see some bruising on the scalp. But generally they don't have that sort of deeper brain injury. They don't have impaired consciousness, problems with their breathing and circulation. Generally, they do fine, very well in fact.
>
> . . . .
>
>
> What [was most] compelling to me was the extent of the injuries to [B.W.'s] head. There was [sic] more than six or eight impact sites to her head. She had what looked like marks, you know, around her eyes from say strangulation. She had extensive brain injury, extensive retinal hemorrhages, and just life threatening symptoms that we just really see when children have had inflicted trauma to their brains.

---

[3] In speaking with Webb, Dr. Harper observed that Webb was not tearful or upset like she would have expected a mother to be upon learning that her child had sustained life-threatening injuries.

5

The State next called Ramiro Hernandez Jr. to testify; however, before Hernandez took the stand, Samora objected to any testimony that Hernandez may offer as impermissible testimony about extraneous bad acts and argued that the State had not provided proper notice of its intent to use Hernandez's testimony at trial. The State countered Samora's objection by arguing that Hernandez's testimony went to the intent element of the offense and did not constitute inadmissible extraneous-bad-act testimony. The trial court overruled Samora's objection, and Hernandez was allowed to testify.

Hernandez testified that he had known Samora for five or six years and that during the time in question, he lived with Samora. Hernandez recalled several incidents where Samora mistreated B.W. Hernandez stated that B.W. was scared of Samora and that Samora repeatedly complained about B.W. crying "for no damn reason." Hernandez remembered Samora putting a lit cigarette in B.W.'s mouth and an incident where B.W.'s urine-filled diaper leaked onto Samora's shirt and Samora responded by getting "pissed off" and calling B.W. a "f'ing nigger baby."[4] Hernandez testified that Samora called B.W. a "nigger baby" all the time and that Samora would put a comforter on B.W.'s head to make her fall down.[5]

On cross-examination, Samora's trial counsel attempted to draw a distinction between the terms "nigga" and "nigger" by elucidating testimony from Hernandez that the term "nigga" is used to refer to friends, while the term "nigger" is derogatory. Hernandez admitted that he and his friends regularly called each other "nigga" as a term of

---

[4] The record reflects that B.W.'s father is African-American.

[5] Webb testified that Samora would roll B.W. up in the comforter and then push her down the hall to let the comforter unroll while B.W. was still in it. It was established that the carpet in the residence was thin and that a step was near the place where Samora would "unroll" B.W. in the comforter.

endearment. On re-direct examination, Hernandez acknowledged that Samora would regularly hit B.W. in the back of the head and say, "what's up, nigga baby." Hernandez also testified that Samora desired to be an Ultimate Fighting Championship fighter or boxer.

Corina Samora, Samora's mother who also lived at the residence, testified that she had a good relationship with B.W., even though B.W. was not Samora's child and that, on the night in question, she took B.W. to a laundromat, a local Stripes convenience store, and McDonald's. Corina stated that B.W. had some "red bruising and blood clotting" on her ear and was fussy at this time but that, generally speaking, B.W. appeared to be in good health. Security camera footage obtained from the Stripes convenience store revealed that B.W. was walking and talking. After leaving the convenience store, Corina took B.W. to McDonald's to get some chicken nuggets; however, B.W. only took a few bites and then refused to eat. Corina was concerned about B.W.'s health at this time but chose not to take her to the doctor or the hospital. Corina returned to the residence with B.W. at 7:00 p.m. on January 2, 2009. Corina acknowledged that B.W. was afraid of Samora and that Samora often called B.W. a "nigga baby" in a joking manner. Corina also testified that Samora was not a racist because he had African-American friends and because he had previously dated an African-American woman. Corina denied ever hurting B.W. and concluded her testimony by noting that Samora was good with children.[6]

Webb stated that she did not have primary custody of B.W., but that she and B.W. occasionally stayed at Samora's residence. Webb recalled that B.W. and Samora were

[6] Natalie Gaytan, Samora's sister, testified that she lived with Samora at the time of the incident, and that she did not notice any bruising on B.W. when changing B.W.'s diaper during the day of January 2, 2009; however, when re-called to testify later in the trial, Gaytan stated that she observed bruising on B.W.'s ears on January 1, 2009.

not close and that B.W. was scared of Samora. In fact, Webb told B.W. that she was going to tell Samora when B.W. misbehaved and B.W. immediately would stop crying. Webb remembered seeing Samora hit B.W. on the back of the head and call her "little nigger baby." Webb noted that Samora was aware that B.W. was scared of him, but Samora would pick B.W. up anyway. Webb acknowledged that Samora would throw B.W. up in the air and catch her, even though B.W. cried and was scared. With respect to the incident where B.W.'s diaper leaked onto Samora's shirt, Webb testified that, after the incident, Samora took his shirt off and threw the urine-soaked shirt at B.W. Webb then took the shirt off B.W. and set it aside. Samora then picked the shirt up and threw it at Webb, imploring her to smell the shirt because "it's your daughter's pee." Webb further testified that Samora would call B.W. a "nigger baby" regularly and that he placed cigarettes in B.W.'s mouth. However, Webb denied that the cigarettes were ever lit because the lighter in the house did not work.

Regarding the night in question, Webb noted that B.W. was congested and was coughing, as she was battling a cold. Webb also noted that B.W. did not have much of an appetite that night, but, other than the cold and loss of appetite, B.W. was "okay." Webb recalled that, on the night in question, she was in Aransas Pass, Texas, until around 10:30 p.m., when she returned to the residence to check on B.W. Webb noticed that B.W. was asleep with Corina, so Webb took B.W. to the room that Webb shared with Samora and put B.W. back to sleep. Webb did not remember B.W. saying anything at this point. B.W. just looked around and went back to sleep. Webb then went to watch television in the living room until she retired to the room where B.W. was sleeping at 1:18 a.m.

At 3:48 a.m., Samora returned to the residence and woke Webb up. Samora told

8

Webb to wake up because they were going to watch a movie. He also instructed Webb to go get them something to eat at Whataburger. Webb complied. Upon returning to the residence approximately fifteen or twenty minutes later, Webb noticed that the front door and the door to Samora's bedroom were locked, even though Webb had not locked either door when she left. When Webb tried to enter the bedroom, Samora asked, "Katlyn, is that you," to which Webb responded, "yes." Samora then let Webb in and left the room. Webb looked over to see if B.W. was still asleep. Webb noticed that B.W. was facing a different direction while sleeping, but was not overly concerned about B.W., so she went to the living room to eat their food. A couple of minutes later, Webb heard B.W. coughing and went to the room to check on B.W. Webb patted her on the back, and Samora entered the room and told Webb to try to get B.W. to "spit some of that stuff up because it sounds ugly." When Webb tried to sit B.W. up, B.W. was unresponsive, and Webb began to panic. Webb then recounted:

> We were patting her back . . . . She was coughing, and she kind of was like pushing us away. She ended up throwing up. And then I noticed her getting stiff and like having kind of like seizures, and then she threw up a second time. Then she would act like she wasn't responsive, and I would get scared. But then she would start being responsive again. It was like off and on.

Webb testified that Samora helped her try to revive B.W., but that the couple decided not to call 911 at this point because they were scared and did not know what to do. They tried putting B.W. in the shower next, but B.W.'s condition did not improve. After several hours of trying to revive B.W., Webb finally took B.W. to the hospital. Webb could not explain why Samora did not accompany them to the hospital, but she did remember arriving at the hospital around 6:02 a.m. on January 3, 2009. Webb admitted that she repeatedly spoke

9

to Samora via her cell phone while at the hospital and that, when asked by a social worker at the hospital, she identified Samora as Anthony Canales, the last name of Samora's stepfather and a name that Samora never used.

When asked about B.W.'s injuries, Webb remembered seeing four small bruises on B.W.'s back when they put B.W. in the shower on the night of the incident. Later, Webb recounted that B.W. also had bruising on her ears when she moved B.W. from Corina's room to the bedroom.[7] Webb testified that Samora would color with B.W. and play with her on occasion. Webb then admitted to not telling social workers everything that had transpired or about all of Samora's interactions with B.W. because she never saw him actually physically hurt B.W. Webb admitted that Samora bit B.W. on her arm and left bruises a couple of times when the two were playing.

On cross-examination, Webb denied ever giving B.W. chest compressions and noted that, when Samora would call her cell phone while she was at the hospital, he would always ask who Webb had talked to and what had transpired.[8] Webb denied trying to protect Samora even though the two have continued their relationship while both are in custody. She further stated that she used the false name to identify Samora in an effort to not involve him.[9]

Webb later recounted that social workers at the hospital accused her of changing her story several times, but she explained that the inconsistencies in her story were due

---

[7] On cross-examination, Webb testified that, shortly before the incident, B.W. had been treated for an unspecified eye condition, and that she had encounters on prior occasions with Child Protective Services regarding B.W.

[8] When Webb was asked about a notation made by a nurse at Driscoll who allegedly overheard Webb "saying something about keeping the story straight" to someone on the phone, Webb denied ever saying that and denied ever changing her story or lying to investigators to protect her boyfriend, Samora.

[9] The record reflects that Webb was charged with an unknown offense pertaining to this incident.

to a faulty memory and the social workers forcing her to guess about what had happened to B.W. Webb also admitted that she "felt weird" leaving B.W. in Samora's sole custody while she went to Whataburger.

Michael Burke, M.D., the pediatric neurosurgeon at Driscoll who operated on B.W.'s brain, testified that B.W. would have become symptomatic the second the injuries to her brain occurred. He further testified that it was his opinion that B.W.'s brain injuries were caused by the physical abuse by another person and that a single blow to the head would not have caused the injuries B.W. sustained. At one point in his testimony, Dr. Burke compared B.W.'s brain injuries to those one would suffer if ejected from a car in a sixty-five-mile-per-hour-rollover accident. Like Dr. Harper, Dr. Burke disagreed with notes made by another doctor at Driscoll that B.W.'s brain injuries occurred approximately eight to twelve hours prior to checking in at the hospital. Dr. Burke then testified, without objection, as to the following: "Yes, I know who did it, based on their own history. I took a history. The mother [Webb] and Anthony [Samora] were present with the child when the child became symptomatic. The injuries will become symptomatic immediately. The mother and/or Anthony did this."

## B. Samora's Evidence

Samora called four witnesses—Kristi Escamilla, Robert Rodriguez, Jacob Galvan, and Eric Flores—to testify on his behalf. Each testified that they were friends with Samora and had known him for several years. Several of the witnesses stated that they have children, and that Samora was good to their children. The witnesses recounted instances when Samora would play with their children and stated that Samora interacted positively with several African-Americans with whom he came in contact. Several of the witnesses

testified that Hernandez did not have a reputation in the community for being truthful and that the friends often called each other "nigga" as a term of endearment.

After both parties rested, the trial court found Samora guilty of the first-degree offense of injury to a child and subsequently sentenced him to fifty years' incarceration in the Institutional Division of the Texas Department of Criminal Justice. Samora filed a motion for new trial and a motion in arrest of judgment, both of which were overruled by operation of law. *See* TEX. R. APP. P. 21.8(a), (c). This appeal followed.

## II. SAMORA'S OBJECTIONS TO DETECTIVE FLORES'S TESTIMONY

By his second issue, Samora asserts that the trial court erred in overruling his objection to a portion of Detective Flores's testimony. Specifically, Samora complains that Detective Flores's statements regarding Samora's failure to immediately come to the hospital to attend to the child constitute inadmissible hearsay because Detective Flores lacked personal knowledge about when Samora showed up to the hospital. *See* TEX. R. EVID. 802 (providing that hearsay testimony is not admissible unless allowed by statute or an exception to the hearsay rule). Samora contends that this evidence "was harmful" and "created an important link early in the trial as it tended to show the guilt of the defendant from the outset of the case." The State counters by arguing that Samora failed to preserve this issue because Samora's trial counsel did not obtain a ruling on his hearsay objection. The State further argues that error, if any, in the admission of Detective Flores's statements was harmless because it was cumulative of other uncontroverted testimony offered at trial.

Samora's second issue centers on the following exchange between Detective Flores

12

and the State:

> [The State]: Do you know how long the child had been at Driscoll [Children's Hospital] before the Defendant arrived at the hospital?

> [Detective Flores]: I know that [B.W.] was brought in about 6:30 in the morning. I got there between 10:45 and 11:00, and he [Samora] probably arrived maybe an hour later.

> [The State]: Was it your understanding based on your preliminary investigation there at Driscoll that he had not been present until the time he arrived?

> [Defense counsel]: Your Honor, I'm going to object. That calls for hearsay and lack of personal knowledge.

> [The State]: Your Honor, I'm asking not what somebody said but what she was able to ascertain when she made contact with people at Driscoll.

> [Defense counsel]: That would not be based on her personal knowledge, Your Honor.

> [The Court]: Just rephrase and let me hear that.

> [The State]: Were you able to determine whether or not the Defendant had been at the hospital prior to the time that you saw him?

> [Detective Flores]: Yes.

> [The State]: And had he been there?

> [Detective Flores]: No.

> [Defense counsel]: Your Honor, same objection.

> [The State]: When you first made contact with the Defendant, was it immediately upon his arrival there at the hospital?

13

[Detective Flores]:   Yes.

As noted above, Samora objected to the State's line of questioning regarding when Samora arrived at the hospital, asserting that Detective Flores's statements constituted inadmissible hearsay. *See id.* The trial court ostensibly sustained Samora's objection by requesting that the State rephrase the question. The State rephrased, and Samora, once again, lodged a hearsay objection. *See id.* However, Samora did not obtain a ruling from the trial court on his objection to the rephrased question.

In order to preserve error for appellate review, Texas Rule of Appellate Procedure 33.1(a) requires a party to:  (1) present a timely objection; (2) state the specific grounds for the objection; and (3) *obtain a ruling*. TEX. R. APP. P. 33.1(a); *see Lopez v. State*, 253 S.W.3d 680, 684 (Tex. Crim. App. 2008) (citing *Geuder v. State*, 115 S.W.3d 11, 13 (Tex. Crim. App. 2003)).[10]   Here, Samora did not obtain a ruling from the trial court on his objection to the rephrased question.

Nevertheless, even if Samora had preserved this issue for appellate review, we conclude that the trial court's admission of the complained-of statements was harmless because:  (1) Detective Flores offered substantially similar testimony at the beginning of the highlighted exchange—Samora arrived at the hospital approximately one hour after Detective Flores's 10:45 a.m. or 11:00 a.m. arrival—that was not objected to, *see Lane v. State*, 151 S.W.3d 188, 193 (Tex. Crim. App. 2004) (stating that "'[a]n error [if any] in the

---

[10] Texas Rule of Appellate Procedure 33.1(a) also provides that a complaint may be preserved for appellate review if:  (1) an objection stating grounds with specificity is made in a timely manner; (2) the applicable rules of evidence and civil and appellate procedure are complied with; and (3) the trial court refused to rule on the objection and the complaining party objected to the refusal to rule. TEX. R. APP. P. 33.1(a). To the extent that Samora could argue that the trial court refused to rule on his objection, we note that the record does not indicate that Samora objected to the trial court's purported refusal to rule on the objection. *See id.* at R. 33.1(a)(2)(B). Therefore, such an argument lacks merit. *See id.* at R. 33.1(a).

14

admission of evidence is cured where the same evidence comes in elsewhere without objection'"); and (2) Detective Flores's statements merely recounted the particulars of her investigation into the incident and how Samora became a suspect, which is admissible at trial. *See Lee v. State*, 29 S.W.3d 570, 577 (Tex. App.–Dallas 2000, no pet.) ("Police officers may testify to explain how the investigation began and how the defendant became a suspect.") (citing *Dinkins v. State*, 894 S.W.2d 330, 347 (Tex. Crim. App. 1995); *Short v. State*, 995 S.W.2d 948, 954 (Tex. App.–Fort Worth 1999, pet. ref'd); *Thornton v. State*, 994 S.W.2d 845, 854 (Tex. App.–Fort Worth 1999, pet. ref'd)). Accordingly, we overrule Samora's second issue.

### III. EVIDENCE OF SAMORA'S PRIOR BAD ACTS

By his third issue, Samora argues that the trial court erred in allowing into evidence information about Samora's alleged prior bad acts in violation of Texas Rules of Evidence 403 and 404. *See* TEX. R. EVID. 403, 404. Specifically, Samora complains about the admission of witness testimony from Hernandez and Webb chronicling his alleged treatment of B.W. The State argues that Samora's objections to the complained-of evidence were premature and, therefore, did not preserve this issue for appellate review. The State also argues that Samora waived his right to notice of such evidence because he did not obtain a ruling from the trial court on his discovery request brought pursuant to article 38.37 of the code of criminal procedure and that error, if any, was harmless because Samora has not made a showing of, nor does the record reflect, harm flowing from the admission of the evidence. *See* TEX. CODE CRIM. PROC. ANN. art. 38.37 (Vernon Supp. 2009).

### A. Standard of Review and Applicable Law

15

We review a trial court's admission of extraneous offense evidence under an abuse of discretion standard. *Powell v. State*, 63 S.W.3d 435, 438 (Tex. Crim. App. 2001). A trial court abuses its discretion if its ruling is outside the zone of reasonable disagreement. *Id.*; *see Casey v. State*, 215 S.W.3d 870, 879 (Tex. Crim. App. 2007). "An appellate court would misapply the appellate abuse of discretion standard of review by reversing a trial court's admissibility decision solely because the appellate court disagreed with it." *Powell*, 63 S.W.3d at 438.

### 1.    Texas Rule of Evidence 404(b)

Pursuant to rule 404(b), evidence of other crimes, wrongs, or acts is inadmissible "to prove the character of a person in order to show action in conformity therewith." *Berry v. State*, 233 S.W.3d 847, 858 (Tex. Crim. App. 2007); *see* TEX. R. EVID. 404(b). However, such evidence is admissible if offered for another purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. TEX. R. EVID. 404(b); *see De La Paz v. State*, 279 S.W.3d 336, 342-43 (Tex. Crim. App. 2009).

### 2.    Texas Code of Criminal Procedure Article 38.37

Article 38.37, section 2 of the code of criminal procedure provides, with respect to certain crimes committed against children under seventeen years of age, that:

> Notwithstanding Rules 404 and 405, Texas Rules of Evidence, evidence of other crimes, wrongs, or acts committed by the defendant against the child who is the victim of the alleged offense shall be admitted for its bearing on relevant matters, including:
>
> > (1) the state of mind of the defendant and the child; and
> >
> > (2) the previous and subsequent relationship between the defendant

16

and the child.

TEX. CODE CRIM. PROC. ANN. art. 38.37, § 2.  Article 38.37, section 3, however, requires the State to give the defendant notice of its intent to use such evidence in its case-in-chief upon a timely request by the defendant and in the same manner as required by Texas Rule of Evidence 404(b).  *Id.* § 3.

**B.      Hernandez's Testimony**

As noted earlier, Samora complained about Hernandez's testimony before Hernandez even took the stand, making procedural and substantive objections.  At that time, it was not entirely clear as to what Hernandez would testify to, and, as the State asserts, Samora's "objection did not specify any certain, identifiable incidents, but merely attempted to prevent Hernandez from testifying at all."  In addition, as part of his pre-emptive procedural objection to Hernandez's testimony, Samora complained about the State's alleged failure to provide notice of its use of Samora's extraneous bad acts at trial.

**1.      Notice of Hernandez's Testimony Regarding Prior Bad Acts**

The record reflects that Samora requested notice of the State's intent to use evidence of Samora's extraneous bad acts at trial under, among other things, rule 404(b) of the rules of evidence and article 38.37 of the code of criminal procedure.  *See* TEX. R. EVID. 404(b); *see also* TEX. CODE CRIM. PROC. ANN. art. 38.37.  Samora's objection at trial, however, did not comport with his previously-filed request for notice.  Samora notified the trial court that the State had failed to provide him notice of the extraneous bad acts, but Samora did not explicitly ask the trial court to rule on his article 38.37 request for notice of extraneous bad acts.  Samora's failure to make a specific request to the trial court under

17

article 38.37, and his failure to obtain a ruling on such a request, waives the article 38.37 notice requirement.  *See* TEX. R. APP. P. 33.1(a); *Espinosa v. State*, 853 S.W.2d 36, 38-39 (Tex. Crim. App. 1993) (per curiam) ("[W]hen a defendant relies on a motion for discovery to request notice . . . it is incumbent upon him to secure a ruling on his motion in order to trigger the notice requirements of that rule."); *see also Mitchell v. State*, 982 S.W.2d 425, 427 (Tex. Crim. App. 1998) (holding that when a request asks the trial court to enter an order and asks the State to provide notice, the request is insufficient to trigger the duty to provide notice).  As such, we conclude that Samora failed to trigger the notice requirement of article 38.37, and therefore, the trial court did not err in denying Samora's objection with respect to lack of notice.  *See Espinosa*, 853 S.W.2d at 38-39; *see also Mitchell*, 982 S.W.2d at 427.  Moreover, Samora's appellate arguments center on rule 404(b) of the rules of evidence, and, as stated earlier, article 38.37 allows for the introduction of such evidence "[n]otwithstanding Rules 404 and 405, Texas Rules of Evidence"; thus, we need only analyze the trial court's admission of testimony chronicling Samora's prior bad acts under article 38.37.  *See* TEX. R. APP. P. 47.1; *see also* TEX. CODE CRIM. PROC. ANN. art. 38.37.

### 2.    Samora's Substantive Objection to Hernandez's Testimony

The substantive portion of Samora's pre-emptive objection to Hernandez's testimony complained that testimony regarding his extraneous bad acts was irrelevant and highly prejudicial within the context of rule 403.  *See* TEX. R. EVID. 403.  However, we note that, to preserve error, an objection must be timely.  *See* TEX. R. APP. P. 33.1(a)(1).  To be considered timely, the objection must be made at the first opportunity or as soon as its basis becomes apparent.  *See Dinkins*, 894 S.W.2d at 335; *Wilson v. State*, 44 S.W.3d

18

602, 606 (Tex. App.–Fort Worth 2001, pet. ref'd); *see also Moore v. State*, No. 01-05-00536-CR, 2006 Tex. App. LEXIS 9945, at \*\*6-7 (Tex. App.–Houston [1st Dist.] Nov. 16, 2006, pet. ref'd) (mem. op., not designated for publication).  Several Texas courts have held, in unpublished opinions, that premature objections do not preserve error for appeal. *See, e.g., Moore*, 2006 Tex. App. LEXIS 9945, at \*7; *Riley v. State*, No. 10-02-202-CR, 2003 Tex. App. LEXIS 10877, at \*\*2-3 (Tex. App.–Waco Dec. 31, 2003, pet. ref'd) (mem. op., not designated for publication); *Singleton v. State*, Nos. 05-92-01702-CR, 05-92-01703-CR, 05-92-01704-CR, 1993 WL 493734, at \*3 (Tex. App.–Dallas Nov. 30, 1993, pet. ref'd) (not designated for publication).  In addition, the court of criminal appeals has specifically stated that, for an issue pertaining to the admission of evidence to be preserved, a proper objection must be made "'each time the inadmissible evidence is offered or obtain a running objection.'" *Lane*, 151 S.W.3d at 193 (quoting *Valle v. State*, 109 S.W.3d 500, 509 (Tex. Crim. App. 2003)).

Here, Samora did not object each time Hernandez testified to Samora's purported extraneous bad acts, nor did he obtain a running objection from the trial court.  *See Lane*, 151 S.W.3d at 193; *Valle*, 109 S.W.3d at 509.  Instead, Samora simply lodged a pre-emptive objection to all of Hernandez's testimony even though it was not clear as to what Hernandez was going to testify to at the time the objection was made.  *See Dinkins*, 894 S.W.2d at 335; *Wilson*, 44 S.W.3d at 606; *see also Moore*, 2006 Tex. App. LEXIS 9945, at \*\*6-7.

Moreover, even if Samora had properly preserved his complaint about Hernandez's testimony, we conclude that the trial court did not abuse its discretion in admitting Hernandez's testimony regarding Samora's purported extraneous bad acts because it falls

19

within the purview of article 38.37, section 2. *See* TEX. CODE CRIM. PROC. ANN. art. 38.37, § 2. Hernandez testified to various instances of abuse perpetrated by Hernandez against B.W., including: (1) hitting B.W. and calling her a "little nigger baby"; (2) putting lit cigarettes in B.W.'s mouth; (3) throwing a urine-soaked shirt at B.W.; and (4) throwing a comforter on B.W. to make B.W. fall down. Hernandez's testimony describes the history of the relationship between Samora and B.W. and establishes Samora's consistently hostile behavior or, in other words, his state of mind as it relates to B.W. *See id.*

Rule 403 provides that "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." TEX. R. EVID. 403. Texas courts have held that even when evidence of a defendant's extraneous acts is relevant under article 38.37, the trial court is still required to conduct a rule 403 balancing test upon proper objection or request. *See Hitt v. State*, 53 S.W.3d 697, 706 (Tex. App.–Austin 2001, pet. ref'd) (citing *Walker v. State*, 4 S.W.3d 98, 103 (Tex. App.–Waco 1999, pet. ref'd); *Poole v. State*, 974 S.W.2d 892, 897 (Tex. App.–Austin 1998, pet. ref'd); *Ernst v. State*, 971 S.W.2d 698, 700-01 (Tex. App.–Austin 1998, no pet.); *Stahle v. State*, 970 S.W.2d 682, 689 (Tex. App.–Dallas 1998, pet. ref'd); *Hinds v. State*, 970 S.W.2d 33, 35 (Tex. App.–Dallas 1998, no pet.)). Rule 403 does not require that the balancing test be performed on the record. *See Yates v. State*, 941 S.W.2d 357, 367 (Tex. App.–Waco 1997, pet. ref'd). It is assumed that the trial court applied a rule 403 balancing test and determined that the evidence is admissible when it overrules a rule 403 objection. *See id.*; *see also Poole*, 974 S.W.2d at 897. Based on our

review of the evidence, we conclude that Hernandez's testimony is relevant[11] and probative of the relationship between Samora and B.W. and any prejudice created by the admission of such evidence is outweighed by the probative nature of the evidence. *See* TEX. R. EVID. 403. Thus, we cannot say that the trial court abused its discretion in overruling Samora's rule 403 objection. *See id.*; *see also Powell*, 63 S.W.3d at 438.

Based on the foregoing, we conclude that the trial court did not abuse its discretion in allowing Hernandez to testify as to Samora's relationship with B.W. and various instances where Samora engaged in inappropriate conduct with B.W.[12] *See Powell*, 63 S.W.3d at 438.

## C. Webb's Testimony

Regarding his complaint about Webb's testimony, Samora directs us to the following exchange:

[The State]: Was there ever a time that [B.W.] went to your mom's house or back to [the biological father's] house and she had bite marks on her?

[Webb]: Yes ma'am.

[Defense counsel]: Your Honor, I'm going to object, relevance.

---

[11] Texas Rule of Evidence 401 defines "[r]elevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." TEX. R. EVID. 401. Furthermore, rule 402 provides that all relevant evidence is generally admissible. *Id.* at R. 402.

[12] We also note that Samora did not specifically object to portions of Webb and Corina's testimony that corroborated Hernandez's testimony regarding the various incidents between Samora and B.W. *See Lane v. State*, 151 S.W.3d 188,193 (Tex. Crim. App. 2004) (holding that any error in the admission of evidence is generally cured if the same or substantially similar evidence is admitted elsewhere in the trial); *see also Valle v. State*, 109 S.W.3d 500, 509 (Tex. Crim. App. 2003) ("Our rule . . . is that overruling an objection to evidence will not result in reversal when other such evidence was received without objection, either before or after the complained-of ruling."); *Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998) (holding that this rule applies whether evidence that is the same or substantially similar to the complained-of evidence is introduced by the defendant or the State). Therefore, any potential error in permitting Hernandez to testify as to Samora's inappropriate conduct towards B.W. would be harmless.

THE COURT:          Come forward.

(Bench conference)

THE COURT:          The objection is relevance.

[The State]:          Your Honor, it goes to intent again. This was a gradual process where he started abusing this child physically and emotionally.

THE COURT:          Is that what you're trying to establish?

[The State]:          Yes.

[Defense counsel]:   Your Honor, also my objection would be that there was really no clear identity as to who did these bite marks. The story changed. Additionally, I have not been given proper notice under my request to the State regarding extraneous offenses that they were going to be bringing these up in the case[-]in[-]chief.

[The State]:          Your Honor, it's not an extraneous offense. It's part of the continuing course of conduct of this Defendant. And not only that, it's been clear in the discovery that initially she said it was her and then she said it was her and Tank. It's in the discovery. It's in the statements that she gave.

THE COURT:          The objection is overruled.

Once again, Samora makes procedural and substantive objections to testimony regarding Samora's prior bad acts against B.W. With respect to the procedural aspect of his objection, Samora does not reference article 38.37 or any other notice provisions in his objection, nor does the record reflect that Samora obtained a ruling from the trial court specifically pertaining to article 38.37. *See* TEX. R. APP. P. 33.1(a); *Espinosa*, 853 S.W.2d at 38-39; *see also Mitchell*, 982 S.W.2d at 427. We conclude that Samora's failure to object under article 38.37 and obtain a ruling waives the notice requirement and, thus,

22

does not preserve for appellate review his notice arguments pertaining to Webb's testimony.  *See Espinosa*, 853 S.W.2d at 38-39; *see also Mitchell*, 982 S.W.2d at 427.

Samora's substantive arguments about Webb's testimony center on rules 403 and 404.  In particular, Samora argues that the testimony was irrelevant and, thus, nor probative because Webb did not initially identify Samora as the individual who caused the bite marks.  However, Samora's argument is belied by later testimony offered by Webb identifying Samora as the individual who left bite marks on B.W. when they were playing.  *See Lane*, 151 S.W.3d at 193; *see also Valle*, 109 S.W.3d at 509; *Leday*, 983 S.W.2d at 718.  Like Hernandez's testimony, Webb's testimony regarding bite marks on B.W. falls within the purview of article 38.37, as it illustrates the relationship between Samora and B.W.  *See* TEX. CODE CRIM. PROC. ANN. art. 38.37, § 2.  Because this testimony is relevant and probative of the relationship between Samora and B.W, we further conclude that the trial court did not abuse its discretion in determining that the probative value of this testimony outweighed any prejudicial effect.  *See* TEX. R. EVID. 402, 403; *see also Powell*, 63 S.W.3d at 438.  Based on the foregoing, we overrule Samora's second issue.

### IV.  LEGAL AND FACTUAL SUFFICIENCY

By his first issue, Samora contends that the evidence supporting his conviction is legally and factually insufficient.  We disagree.

### A.  Standard of Review and Applicable Law

In reviewing the legal sufficiency of the evidence, an appellate court must review all the evidence in the light most favorable to the verdict, and ask whether "'*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable

doubt—not whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009) (quoting *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979)) (emphasis in original). The trier of fact is the sole judge of the facts, the credibility of the witnesses, and the weight given to testimony. *See* TEX. CODE CRIM. PROC. ANN. art. 38.04 (Vernon 1979); *Jackson*, 443 U.S. at 318-19; *Beckham v. State*, 29 S.W.3d 148, 151 (Tex. App.–Houston [14th Dist.] 2000, pet. ref'd). We do not reevaluate the weight and credibility of the evidence, and we do not substitute our own judgment for that of the trier of fact. *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000) (en banc); *Beckham*, 29 S.W.3d at 151. We resolve any inconsistencies in the evidence in favor of the judgment. *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).

In conducting a factual sufficiency review, a court of appeals reviews the evidence in a neutral light to determine whether the evidence is so weak that the jury's verdict seems clearly wrong and manifestly unjust or against the great weight and preponderance of the evidence. *Neal v. State*, 256 S.W.3d 264, 275 (Tex. Crim. App. 2008); *Watson v. State*, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006). Unless the record clearly reveals that a different result is appropriate, we must defer to the fact-finder's determination concerning the weight to be given to contradictory testimony. *Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008).

The State is not required to present direct evidence, such as eyewitness testimony, to establish guilt. *See Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004). "Circumstantial evidence is as probative as direct evidence in establishing guilt of the actor, and circumstantial evidence alone can be sufficient to establish guilt." *Hooper v. State*,

24

214 S.W.3d 9, 13 (Tex. Crim. App. 2007); *see Guevara*, 152 S.W.3d at 49. The law does not require that each fact "point directly and independently to the guilt of the appellant, as long as the cumulative effect of all the incriminating facts is sufficient to support the conviction." *Hooper*, 214 S.W.3d at 13; *see Guevara*, 152 S.W.3d at 49.

Both legal and factual sufficiency are measured by the elements of the offense as defined by a hypothetically correct jury charge. *Grotti v. State*, 273 S.W.3d 273, 280-81 (Tex. Crim. App. 2008); *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997); *see Adi v. State*, 94 S.W.3d 124, 131 (Tex. App.–Corpus Christi 2002, pet. ref'd). "'Such a charge [is] one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof, or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried.'" *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009) (quoting *Malik*, 953 S.W.2d at 240).

Under the Texas Penal Code, "[a] person commits an offense [of injury to a child] if he intentionally, knowingly, recklessly, or with criminal negligence, by act or intentionally, knowingly, or recklessly by omission, causes to a child . . . a serious bodily injury . . . ." TEX. PENAL CODE ANN. § 22.04(a)(1); *see Jefferson v. State*, 189 S.W.3d 305, 312 (Tex. Crim. App. 2006). Section 22.04 defines a "child" as a person fourteen years of age or younger. TEX. PENAL CODE ANN. § 22.04(c)(1). "'Serious bodily injury' means bodily injury that creates a substantial risk of death or that causes death . . . ." *Id.* § 1.07(a)(46) (Vernon Supp. 2009).

"'[A]ct or omission' constitute the means of committing the course of conduct element of injury to a child." *Jefferson*, 189 S.W.3d at 312. "[T]he essential element or

25

focus of the statute is the result of the defendant's conduct (in this case, serious bodily injury to a child) and not the possible combinations of conduct that cause the result." *Id.*; *see Alvarado v. State*, 704 S.W.2d 36, 39 (Tex. Crim. App. 1985) (stating that, because the injury-to-a-child statute does not specify the "nature of conduct," the nature of the conduct is inconsequential as long as "the conduct (whatever it may be) is done with the required culpability to effect the *result* the Legislature has specified") (emphasis in original).

The record reflects that Samora was charged with first-degree injury to a child, which, as provided by section 22.04(e), requires the fact-finder to conclude that the defendant committed the offense intentionally or knowingly. *See* TEX. PENAL CODE ANN. § 22.04(e). A person acts intentionally "with respect to . . . a result of his conduct when it is his conscious objective or desire to . . . cause the result of his conduct." *Id.* § 6.03(a) (Vernon 2003). A person acts knowingly "with respect to the result of his conduct when he is aware that his conduct is reasonably certain to cause the result." *Id.* § 6.03(b). Intent may "be inferred from circumstantial evidence[,] such as acts, words, and the conduct of the appellant." *Guevara*, 152 S.W.3d at 50; *see also Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002) (stating that a fact-finder may infer both knowledge and intent from the defendant's acts, words, or conduct and from the nature of the wounds inflicted on the victim); *Ledesma v. State*, 677 S.W.2d 529, 531 (Tex. Crim. App. 1984) (noting that the requisite culpable mental state may also be inferred from the surrounding circumstances).

**B.    Discussion**

Here, the evidence demonstrated that, shortly after being in Samora's sole custody, B.W. began to exhibit symptoms—vomiting, losing consciousness, hemorrhaging of the eye and brain cavities—associated with the injuries she sustained. Drs. Harper and Burke

both testified that B.W. would have became symptomatic immediately after sustaining the injuries in question. Webb testified that she noticed that B.W. was not well approximately two minutes after arriving home from her trip to Whataburger. Furthermore, it is noteworthy that the door to the house and the door to Samora's bedroom were both locked when Webb returned home even though Webb had not locked either door when she left, which seems to suggest that Samora was trying to hide something.

The record indicates that B.W. did not have most of the twenty-nine visible bruises, abrasions, and marks on her body, prior to being in Samora's custody. Corina, Samora's mother, testified that B.W. was in good health when she brought B.W. back to the house except for the fact that B.W. was fussy, had a cold, and had reddish bruises on her ears. Detective Flores noted that the security cameras from the Stripes convenience store demonstrated that B.W. was able to walk and talk when she was in Corina's custody. Several witnesses testified to Samora's relationship with B.W. and described a pattern of abusive behavior engaged in by Samora and directed towards B.W. Webb, Corina, and Hernandez all testified that Samora was not close with B.W. and often called her a "nigger baby." The record contains testimony that Samora often hit B.W. on her head, bit her on her arms, threw her up in the air even though B.W. was scared of Samora, and threw a urine-soaked shirt on B.W. after B.W.'s diaper had leaked onto his shirt. Furthermore, Webb and Hernandez recalled seeing Samora: (1) throw a comforter on B.W. to force her to fall down; and (2) place cigarettes in B.W.'s mouth. Hernandez testified that, on one occasion, Samora placed a lit cigarette in B.W.'s mouth; however, Webb refuted Hernandez's testimony by stating that the cigarette could not have been lit while it was in B.W.'s mouth because the lighter located in the house was broken. Webb noted that B.W.

27

was approximately two years old at the time of the incident. Drs. Harper and Burke both testified that B.W.'s injuries were life-threatening and noted that, as a result of the injuries sustained, a resection of half of B.W.'s brain was necessary for her survival.

On appeal, Samora argues that the evidence is legally and factually insufficient based on the following contrary evidence: (1) testimony from several of Samora's friends that Samora was good with their children and that Samora had many African-American friends; (2) testimony that Samora was not a racist and that the use of the phrase "nigga baby" was a term of endearment; (3) testimony that Samora would color with B.W.; (4) testimony that B.W. was not feeling well when she was in Corina's custody; and (5) testimony that B.W. had red marks and bruising on her ears, a lack of an appetite, and was fussy prior to being in Samora's custody. In addition, Samora directs us to Webb's testimony that she did not know who hurt B.W. and that she did not believe that Samora had injured B.W., suggesting that the lack of direct evidence in this case renders the evidence supporting the jury's verdict legally and factually insufficient. Samora also argues that one doctor's opinion that the injuries sustained by B.W. occurred approximately eight to twelve hours prior to Webb checking B.W. in at the hospital at around 6:23 a.m. on January 3, 2009, proves that the injuries sustained could not have been caused by him given that B.W. was in Corina's custody at that time.

Regarding the purported contrary evidence about Samora's interactions with his friends' children and his associations with other African-Americans, we, once again, note that is within the province of the jury to reconcile inconsistencies in the evidence. *See* TEX. CODE CRIM. PROC. ANN. art. 38.04 (Vernon 1979); *Jackson*, 443 U.S. at 318-19; *Curry*, 30 S.W.3d at 406; *King*, 29 S.W.3d at 562; *Beckham*, 29 S.W.3d at 151. With respect to

28

Samora's inference regarding the lack of direct evidence in this case, the court of criminal appeals has held that a conviction may be sustained solely on circumstantial evidence; thus, it is not necessary for the State to present direct evidence establishing Samora's guilt. *See Hooper*, 214 S.W.3d at 13; *see also Guevara*, 152 S.W.3d at 49. Finally, we do not find Samora's argument pertaining to the timing of B.W.'s injuries to be persuasive because both Drs. Harper and Burke disagreed with the findings of the first doctor, whose opinion was based on the initial CAT scan, and the resolution of this inconsistency in the evidence was within the province of the jury to resolve. *See Lancon*, 253 S.W.3d at 705. Clearly, the jury believed the testimony of Drs. Harper and Burke regarding the timing of B.W.'s injuries, and we must defer to the jury's resolution of the facts. *See Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) ("When the record supports conflicting inferences, we must presume that the fact[-]finder resolved the conflicts in favor of the prosecution and therefore defer to that determination.") (citing *Jackson*, 443 U.S. at 326).

Reviewing the evidence in the light most favorable to the verdict, we hold that a reasonable fact-finder could have concluded that Samora intentionally or knowingly caused serious bodily injury to B.W., a child under the age of fourteen beyond a reasonable doubt. *See* TEX. PENAL CODE ANN. § 22.04(a)(1); *Jefferson*, 189 S.W.3d at 312; *see also Jackson*, 443 U.S. at 318-19; *Laster*, 275 S.W.3d at 517. As such, we conclude that the evidence is legally sufficient to sustain Samora's conviction. *See Jackson*, 443 U.S. at 318-19; *Laster*, 275 S.W.3d at 517. Reviewing the evidence in a neutral light, we cannot say that the evidence is so weak that the jury's verdict is clearly wrong and manifestly unjust or against the great weight and preponderance of the evidence. *See Neal*, 256 S.W.3d at 275; *see also Watson*, 204 S.W.3d at 414-15. Accordingly, we conclude that the evidence

is factually sufficient. *See Neal*, 256 S.W.3d at 275; *see also Watson*, 204 S.W.3d at 414-15. We overrule Samora's first issue.

## V. CONCLUSION

Because we have overruled all of Samora's issues on appeal, we affirm the judgment of the trial court.

_____
ROGELIO VALDEZ
Chief Justice

Do not publish.
TEX. R. APP. P. 47.2(b)
Delivered and filed the
19th day of August, 2010.